IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MICHAEL W.,

      Plaintiff,

v.                                                    CIVIL ACTION NO. 2:24-cv-00006

CAROLYN COLVIN,
Acting Commissioner of Social Security,

      Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Michael W. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. (ECF No. 2). This matter was referred by standing order to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3). Presently pending before this Court are Claimant's *Brief in Support of Complaint* (ECF No. 7), the Commissioner's *Brief in Support of Defendant's Decision* (ECF No. 8), and Claimant's *Reply Brief* (ECF No. 11). Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request for

remand (ECF No. 7), **DENY** the Acting Commissioner's request to affirm the final decision (ECF No. 8), **REVERSE** the final decision of the Acting Commissioner; and **REMAND** this matter back to the Acting Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings, for the reasons set forth herein.

## I.    BACKGROUND

### A.    Information about Claimant and Procedural History of Claim

Claimant was 23 years old at the time of his alleged disability onset date and 26 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 179, 305).[1] He has at least a high school education, and past relevant work experience as a landscaping laborer and customer-service representative/telemarketer. (Tr. 24, 310). Claimant alleges that he became disabled on June 28, 2020, due to the following physical impairments: anxiety, depression, bipolar disorder, dyslexia, memory problems, speech issues, stroke, seizures, brain bleeds following a traumatic brain injury, two brain surgeries, nerve damage in his neck and right shoulder, visual and movement issues on the left side of his body, and fractured bones in his face. (Tr. 11, 305, 309; ECF No. 7 at 2).

Claimant filed his application for Title XVI benefits (the "claim") on May 14, 2021. (Tr. 290-296). The Social Security Administration (the "Agency") denied the claim initially on September 24, 2021, and again upon reconsideration on May 19, 2022. (Tr. 179-203). Thereafter, Claimant filed a written request for hearing which was received on August 4, 2022. (Tr. 236). An administrative hearing was held before an ALJ on April 11, 2023. (Tr. 141-178). Subsequently on May 19, 2023, the ALJ entered an unfavorable

---

[1] All references to "Tr." herein refer to the administrative *Transcript of Proceedings* filed in this action at ECF No. 6.

2

decision. (Tr. 8-31). Claimant then sought review of the ALJ's decision by the Appeals Council on June 20, 2023. (Tr. 285-87). Ultimately the Appeals Council denied Claimant's request for review on November 6, 2023, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-7).

Claimant brought the present action on January 4, 2024, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a transcript of the administrative proceedings on February 28, 204. (ECF No. 6). Claimant subsequently filed his *Brief in Support of Complaint* on March 21, 2024. (ECF No. 7). In response, the Commissioner's *Brief in Support of Defendant's Decision* was filed on April 19, 2024. (ECF No. 8). After being granted an extension of time (*see* ECF Nos. 9, 10), Claimant then filed his *Reply Brief* on May 15, 2024. (ECF No. 11). Accordingly, this matter is now ripe for adjudication.

### B.    Relevant Evidence

The undersigned has considered all evidence of record pertaining to the parties' arguments, including the relevant medical evidence, and summarizes the relevant portions herein for the convenience of the United States District Judge.

### i.    Treatment Records

Records show that Claimant was hospitalized in June 2020 after being involved in a high-speed, single vehicle collision where he was unresponsive at the scene and had to be extracted from the vehicle. (Tr. 18). Claimant was hospitalized and intubated; a subsequent computerized tomography ("CT") scan of the head showed that Claimant sustained brain damage as a result of the accident. Specifically, the CT scan impression was an acute comminuted fracture of the right anterior cranial fossa/superior wall of right orbit and small extraconal hemorrhage along the superior margin of the right orbit. (Tr.

408-560). Claimant also sustained multiple skull fractures and facial fractures, including an acute traumatic comminuted fracture of the right temporal bone, superior and left medial orbital wall fractures with fractures extending into the frontal sinuses and frontal bone, and possible nasal bone fractures. (Tr. 425). On June 29, 2020, Claimant underwent a right-side craniotomy with evacuation of epidural hematoma and insertion of the left frontal intra-cranial pressure monitor. (Tr. 434). Further CT-scan findings dated July 5, 2020, showed stable changes of right-frontal craniotomy and stable overlying subdural hematoma. (Tr. 540-41). Claimant was ultimately extubated on July 8, 2020, and discharged to the Charleston Area Medical Center ("CAMC") traumatic brain injury rehabilitation program on July 27, 2020. (Tr. 422-26).

CAMC rehabilitation records indicate that Claimant responded well to medical rehabilitation overall. (Tr. 561-580). On August 10, 2020, the interdisciplinary team found that Claimant made excellent improvements from his traumatic brain injury ("TBI"), and he was deemed to have regained capacity to make his own decisions and to independently engage in all activities of daily living except that he required assistance with bathing and dressing. (Tr. 566). Claimant's attention span was noted to be "good," as it had improved to ninety percent, with "good" visual constancy; further, he was noted to be "planning better." (Tr. 561-66). Claimant's short-term memory was noted to be much improved, and his divergent word-finding had fully recovered. *Id.* He was independent for bed mobility and transfers; able to propel wheelchair independently for greater than 200 feet; was able to ambulate 250 feet without an assistive device; could go upon and down thirty-five steps independently with a rail; and was independent in car transfers. *Id.* Claimant was instructed that he "should not drive a motor vehicle for now . . . should not use power tools or firearms . . . [and] should abstain from alcohol and all

illicit substances." *Id.* Claimant was discharged on August 11, 2020, for outpatient physical and occupational therapy. *Id.*

By February 2021, Claimant's TBI recovery had progressed sufficiently for him to proceed with cranioplasty surgery for repair of a skull defect. (Tr. 625-28). On February 16, 2021, Claimant underwent a right cranioplasty with autologous bone graft and placement of plates and screws. (Tr. 617-626, 627-645). Following surgery, Claimant was admitted to the surgical trauma intensive care unit where he progressed well. (Tr. 631). On February 18, 2021, Claimant reported that his pain was well controlled, and he felt that he was ready for discharge. *Id.* Claimant was discharged that day to return home with family, and instructed not to drive. (Tr. 632).

On March 22, 2021, Claimant was seen by Lana D. Christiano, M.D., of West Virginia OrthoNeuro, to follow up regarding his status-post craniotomy and depressed-skull fracture. (Tr. 620). Dr. Christiano noted that, overall, Claimant was "doing well" though he complained of pain. *Id.* On examination, Dr. Christiano noted that Claimant's incision was healing well and that Claimant's condition was improving. Dr. Christiano recommended over-the-counter pain medication and advised Claimant to return "on an as-needed basis." (Tr. 621). On May 12, 2021, Claimant reported a new complaint of cervical pain with radiculopathy; his treating physician ordered x-rays and physical therapy as well as a referral to neurology for additional evaluation, but it appears that ultimately Claimant did not pursue treatment. (Tr. 741, 747, 760, 779).

On November 3, 2021, Claimant presented for a neurology consult for concerns of seizure activity and tremor. (Tr. 1101). Progress notes from this visit indicate that Claimant "has recovered well" from the June 2020 car accident, "but does have some left-sided deficits," neuropathic pain in his arms, as well as "some seizure activity." *Id.*

Claimant's prescription for Keppra was increased, and the physician recommended that Claimant undergo an electroencephalogram ("EEG") and upper-extremity electromyography ("EMG") and follow up in three months. (Tr. 1102). However, there is no indication in the record whether Claimant pursued this recommended testing.

Subsequently on July 1, 2022, Claimant presented for a neurology consult on referral from his primary-care provider "for the evaluation of paresthesia[] in the neck, low back and extremities." (Tr. 1330-31). Claimant reported pain in his neck, thoracic back, and low back, as well as pain throughout both of his upper and lower extremities, all since the 2020 motor-vehicle accident; however, he denied any numbness or tingling. (Tr. 1331). Claimant denied "headaches, confusion, memory loss, speech difficulty and visual changes." *Id.* Tristan Grose, FNP-BC, stated in treatment notes that "[a]t this time I feel that we should treat the patient more conservatively as there are no abnormalities on his examination." (Tr. 1332). Accordingly, Nurse Grose provided Claimant with a physical therapy referral and instructed Claimant to return "on an as needed basis if his back pain continues after completing a course of physical therapy." *Id.*

Claimant presented for physical therapy beginning on July 6, 2022. (Tr. 1119). On examination, Claimant was found to have slightly decreased muscle strength of the cervical spine, shoulders, hips, knees, and ankles. (Tr. 1119-1121). He had normal reflexes and a negative slump test bilaterally. *Id.* Physical therapist Kyle LeBarron, PT, DPT assessed unspecified chronic low back pain with psychological factors. (Tr. 1122). He prescribed a 90-day course of physical therapy. *Id.* On July 27, 2022, Claimant reported that "he felt as good as he has ever felt since in years." (Tr. 1134). By August 1, 2022, Claimant reported that his back was doing very well; he reported pain mostly into his thighs and calves, and reported that standing too long exacerbated his ankle pain. (Tr.

1132). Claimant's condition continued to improve with physical therapy. On August 10, 2022, Claimant reported that he was experiencing some stiffness/tightness, but no significant pains and that he had been doing his home stretching exercise which continued to help. (Tr. 1128). On August 15, 2022, Claimant reported feeling good after his previous session. (Tr. 1124). A primary care note dated August 16, 2022, indicated that Claimant reported he was doing better with his pain and that physical therapy was helping; on examination, his musculoskeletal system was found to be within normal limits, and he was advised to continue physical therapy for his chronic neuropathic pain. (Tr. 1166-67). Physical therapy notes dated August 22, 2022, indicated that Claimant had "no pain" and was "responding well" to physical therapy. (Tr. 1258). During subsequent visits in August 2022, Claimant was likewise noted to be doing well overall except for a slight flare of pain. (Tr. 1260-62). He reported feeling the therapy was helpful and was doing well at home using electrical muscle stimulation. (Tr. 1245, 1248, 1251, 1254).

By September 2022, treatment notes from Claimant's primary-care provided indicated that Claimant was doing fairly well, with the exception of his complaints of nerve damage in his legs with an inability to keep his legs still. (Tr. 1294). Claimant stated that physical therapy "has really helped his back." (Tr. 1293). He reported that he "has not had any seizures," and that they "have been well controlled on the Keppra" prescription. *Id.* Claimant was prescribed medication for restless legs and referred for continued physical therapy. (Tr. 1283). Notably, Claimant reported that he "is also wanting to start work and has been in touch with . . . a handyman service." (Tr. 1293). Further, Claimant reported that "[h]e thinks this job will be good until he starts college." *Id.*

Physical therapy notes indicate that Claimant returned to physical therapy on November 21, 2022, focusing on his symptom of restless legs. (Tr. 1208). Claimant

reported that he was not having pain, but that constant moving of his legs interfered with his ability to focus on school work. *Id*. Claimant also reported that "his back is feeling great[.]" *Id*. He was able to body weight squat and leg press 200 pounds, pain free. (Tr. 1236). The physical therapist prescribed a six-week course of physical therapy to teach Claimant stretches that would allow him to mitigate the effects from restless leg syndrome independently. (Tr. 1210).

As to Claimant's mental conditions, records from Anchor Medical Group indicate a long history of treatment with Suboxone for opioid-use disorder since at least 2019. (Tr. 1039). Additionally, Claimant was treated with Klonopin for adjustment disorder with mixed anxiety and depressed mood. (Tr. 1026; *see* 730-1042). He followed up weekly at Anchor Medical Group for counseling as well as prescriptions of Suboxone and Klonopin. (Tr. 740). Treatment records indicate that Claimant's condition was chronic and unstable, and that "a lot of his problems are related to his anxiety." (Tr. 765-66). Records dated October 5, 2020, indicated a positive drug screen for heroin, as well as a positive Fentanyl drug screen on June 24, 2021. (Tr. 740, 952). After disputing lab results, he was released to find another treatment program. (Tr. 734).

On July 23, 2021, Claimant presented to the emergency room for unintentional drug overdose. (Tr. 1057). Claimant's mother reported that Claimant's Klonopin prescription was discontinued after he was kicked out of the program at Anchor Medical. *Id*. She expressed a desire to enroll Claimant into an inpatient drug rehabilitation program, and would like to have his decision-making capacity checked. *Id*. Claimant was admitted for a consult with psychology and neurology. *Id*. A drug screen was positive for methamphetamine. *Id*.

Subsequently on July 6, 2022, Claimant was admitted to a psychiatric hospital for self-harm. (Tr. 1109). Claimant reported that he was homeless and harmed himself to relieve stress. *Id.* He also reported experiencing mood swings, and using pain killers and opiates as well as marijuana. (Tr. 1109-1110). A mental-status examination found Claimant was alert and oriented, with overall normal results except that his insight was limited. (Tr. 1112). He was able to name the city, state, governor, current president, and three past presidents; was able to spell a word backward and forward; had an immediate recall of 3/3 as well as a recall of 3/3 after three minutes; and his IQ appeared in the average range. *See id.* Claimant was diagnosed with bipolar affective disorder, depressed; self-mutilation; seizure disorder; history of nerve damage; and migraine headache. *Id.* He was noted to be at an increased risk potential, with high-risk behavior, mood instability, and a "compromised level of functioning." *Id.* Claimant was discharged approximately one week later on July 13, 2022. (Tr. 1115). His diagnosis on discharge was bipolar affective disorder, current episode, depressed, and history of self-mutilation. *Id.* Treatment notes indicate that he was stable on medications, and upon release would be provided with psychiatric and medication management aftercare at a recovery facility. (Tr. 1115-1116).

Subsequently on January 24, 2023, Claimant presented to his primary-care physician for a complaint of pain and swelling of the right foot; there, he reported that his anxiety "has been very bad recently," with panic attacks. (Tr. 1269). Claimant reported that his Vistaril prescription was not as effective as previous medications, and he requested a prescription for Klonopin. *Id.* Tammy Cline, FNP-BC, informed Claimant that she could not prescribe Klonopin, but that she could refer him to a psychiatrist. (Tr. 1270).

Claimant stated that he would try to be seen at Prestera Center during walk-in hours. *Id.* It is unclear from the record whether Claimant was seen at Prestera.

Hospital records from Beckley Appalachian Regional Healthcare ("ARH") indicate that Claimant was admitted on June 24, 2023 after emergency medical services was called to his house due to seizure. (Tr. 48). Claimant's mother reported that Claimant's seizures began occurring due to discontinuation of Klonopin; that Claimant was on Gabapentin and Keppra daily; that Claimant recently ran out of Gabapentin, but was compliant with his daily Keppra. (Tr. 48). Further, Claimant's mother reported that Claimant's seizures "occur due to noncompliance and when he runs out of prescriptions or forgets taking them." *Id.* Claimant's mother reported that Claimant "came out of rehab about 6 months ago and has used heroin on 3 accounts since then." *Id.* She reported that the seizure occurred after Claimant used heroin the previous day. *Id.* Claimant's drug screen was positive for opiates and amphetamines. (Tr. 56). Claimant was assessed with polysubstance use disorder, amphetamine use disorder, opioid use disorder, history of alcohol abuse disorder, status epilepticus, and traumatic brain injury disorder. (Tr. 62-64). Claimant was prescribed Gabapentin, and his Keppra prescription was increased. (Tr. 76). Claimant was instructed not to drive for three months, and was recommended for long-term intervention for his traumatic brain injury in Morgantown, West Virginia. (Tr. 76, 84, 92). Claimant was described as having a confused mental status and being unable to make informed decisions. (Tr. 92). Hospital records indicate that Ms. Clay "refused" to permit hospital staff to place a central line in the Claimant, and instead "collected the patient [and] left the hospital [against medical advice ("AMA")] without completing AMA papers." (Tr. 92-96).

### ii.    Hearing Testimony

At the April 11, 2023 telephonic hearing before the ALJ, Claimant was represented by counsel and testified under oath. (Tr. 17). Claimant testified that he experienced trouble with his memory, including long-term memory, as well as with concentration and decision-making; as a result, he relied upon his mother to help him make decisions and to ensure that he compliance with his medication regimen. (Tr. 17). Claimant also testified experiencing trouble following directions, and knowing which words to choose when speaking. *Id.* Claimant reported experiencing tremors in his hands, and at times in his shoulders; he also reported trouble with vision on the left side which required him to rely on his right eye for vision, although he said that doctors expected his condition to improve over time. *Id.* Claimant testified that his right shoulder and neck would feel "restless" and required stretching all the time; further, he testified that he experienced numbness and tingling in his hands constantly throughout the day, as well as restless leg problems requiring him to continuously shake and stretch. *Id.* Claimant further testified that he was being treated for anxiety and depression; he recounted engaging in self-harm while in rehabilitation. *Id.* Claimant also reported that he experienced panic attacks, especially when riding as a passenger in a vehicle. *Id.* Finally, Claimant testified that he was preparing to start college the following semester. *Id.*

Melissa Clay, the Claimant's mother, also appeared and testified at the hearing. (Tr. 11). Ms. Clay testified that she takes care of the Claimant. (Tr. 17). She described on-and-off tremors, numbness, and shaking in Claimant's hands all of the time, as well as restless legs; additionally, she testified that the Claimant has left-side neglect, making him veer to one side when walking. *Id.* According to Ms. Clay, Claimant's doctor has instructed him not to drive; further, Claimant's memory is generally not good, he has trouble

11

following directions, and he has to be supervised all the time. *Id.* Ms. Clay illustrated by recounting an incident where she sent Claimant to a checkout line at a store with twenty dollars, and he just kept trying to add items until he had amassed far more than twenty dollars' worth. *Id.* Ms. Clay further testified that Claimant often has trouble finding words when speaking. *Id.*

Finally, William Housing Reed, Ph.D., an impartial vocational expert, appeared and testified at the hearing. (Tr. 11). The ALJ asked the VE to classify Claimant's past relevant work. (Tr. 171). The VE testified that Claimant's past work as a landscape specialist groundskeeper is classified as unskilled labor, with a specific vocational preparation ("SVP") of 2. *Id.* The VE characterized this work, as generally performed, as medium in exertion, but as "either medium or heavy" as actually performed based upon Claimant's description. *Id.* Turning to the Claimant's previous position as a telemarketer, the VE classified this work as semi-skilled with an SVP of 3 and sedentary in exertion, both as generally and actually performed. *Id.*

The ALJ then asked the VE to assume that a hypothetical individual had the same age, education, and work history as the Claimant who was capable of performing work at the light exertional level, with some additional limitations. *Id.* Specifically, the hypothetical individual could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; could occasionally balance; could frequently stoop, kneel, and crouch; could occasionally crawl; could never work at unprotected heights; could never work around moving mechanical parts; could tolerate extreme heat and cold frequently; could tolerate vibration occasionally; and could never operate a motor vehicle. (Tr. 171-172). Additionally, the individual would be limited to performing simple work and would need a low-stress work environment defined as no fast-paced production requirements and no

greater than occasional changes in a routine work setting. (Tr. 172). The VE testified that such a hypothetical individual would not be able to perform any of the Claimant's past work. *Id.* However, the VE testified that the hypothetical individual would be able to perform other jobs that were available in the national economy, consisting of light, unskilled positions with an SVP of 2. *Id.* The VE gave three representative examples. *Id.* First, the VE provided the representative example of a housekeeping/cleaner position, reduced to exclude positions in the hotel/motel industry due to a fast-paced production requirement. *Id.* The VE testified that, nationally, there are approximately 16,000 such jobs available, mostly consisting of after-hours work in office buildings and other companies occurring after the workforce is gone. (Tr. 172-173). Second, the VE provided the representative example of a mail clerk, reduced to exclude positions with the United States Postal Service. (Tr. 173). The VE testified that, nationally, there are approximately 11,000 such jobs available. *Id.* Third and finally, the VE provided the representative example of a "marker" position, of which "[n]ationally, approximately 137,000 jobs exist." *Id.* Lastly, the ALJ turned to the issue of an employer's tolerance for off-task time; he asked the VE to opine at what point an individual's off-task time typically precludes sustained employment. *Id.* In response, the VE testified that, for unskilled work, employment is precluded when an individual is "[o]ff task 20 percent and above[.]" *Id.*

Next, in response to a hypothetical question from Claimant's counsel, the VE testified that if the hypothetical individual were limited to "fingering handling and feeling only occasionally with the left hand," which is the non-dominant hand, the representative position of "marker" would be eliminated. (Tr. 174). The VE then opined, in response to another hypothetical question from Claimant's counsel, that all three representative positions would be eliminated if the hypothetical individual would need frequent

13

reminders throughout the job day regarding their job duties. (Tr. 175). Likewise, the VE testified that all three representative positions would be eliminated if the hypothetical individual required frequent over-the-shoulder supervision to be able to perform his or her basic work duties. *Id.* Further, the VE opined that all work would be precluded if the hypothetical individual were not able to adjust to any changes that would occur in the work setting. (Tr. 175-176). Finally, the VE opined that all work would be eliminated if the hypothetical individual was unable to maintain focus and concentration for more than 30 minutes at one time before needing to take a break where they would be off task for 10 minutes twice an hour. (Tr. 176).

### iii.    Consultative Evaluations

Daniel Olsen, M.D., performed a consultative medical examination of the Claimant on August 21, 2021. (Tr. 1084). Claimant was noted to be alert and had appropriate eye contact, speech, and mood; he was noted to be "cooperative during the examination." (Tr. 1087, 1088). Claimant's memory and concentration were noted to be normal, but Claimant also "had difficulty finding words" at times. (Tr. 1087). On examination, Claimant's hand eye coordination was "good," and while Claimant also appeared to have balance issues—particularly on his left side—at times, he was noted to exhibit a "[n]ormal, reciprocal gait pattern" without the use of an assistive device. *Id.* Claimant also reported paresthesia in his right arm upon light palpation. *Id.* Claimant reported to Dr. Olsen that he was able to perform activities of daily living without difficulty and was able to bathe, dress, and feed himself. (Tr. 1088). Dr. Olsen found "no evidence of muscular asymmetry nor atrophy and no acute joint findings." *Id.* Claimant's strength and range of motion were within normal limits bilaterally with the exception of his cervical spine, and range of motion in his shoulder. *Id.* Dr. Olsen further found that Claimant was "able to sit, stand,

and walk," as well as "rise from the exam table multiple times without problems or assistance." (Tr. 1088-89). Claimant's speech, hearing, vision, sensation, and reflexes were all "grossly intact," with normal fine motor coordination and handling." (Tr. 1089). Claimant "answered questions appropriately and within reason" and he was noted to be "alert to person, place, and time." *Id.*

Dr. Olsen opined that Claimant "has significant neurologic injury" due to the 2020 motor-vehicle collision. *Id.* Dr. Olsen stated that Claimant "continues to have seizure episodes and currently can't even drive." *Id.* Dr. Olsen also noted that Claimant "has memory issues as well as difficulty finding words to say occasionally." *Id.* Dr. Olsen further noted paresthesia in Claimant's right-upper extremity as well as "some neglect to his left side resulting in somewhat rare but random movements." *Id.* Based upon these findings, Dr. Olsen opined that, "[i]n all, patient would not be safe returning to work environment, let alone would be difficult given his residual neurologic issues." *Id.*

### iv.    Administrative Findings

On September 1, 2021, Rabah Boukhemis, M.D.—a state-agency medical consultant—reviewed the claim at the initial level and opined that, physically, Claimant was limited to light exertion when standing/walking to a duration of four hours. (Tr. 185, 189). Dr. Boukhemis further opined that Claimant could engage in no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; should avoid concentrated exposure to extreme cold, extreme heat, and vibration; and should avoid even moderate exposure to hazards. *See id.* On May 10, 2022, Amy Wirts, M.D.—also a state-agency medical consultant—reviewed the claim on reconsideration and affirmed Dr. Boukhemis's opinion. (Tr. 194-197).

On September 24, 2021, James Capage, Ph.D.—a state-agency psychological consultant—reviewed the claim at the initial level and opined that Claimant had severe mental impairments; using the special technique to assess the four areas of mental functioning, Dr. Capage opined that Claimant had a "moderate" limitation in understanding, remembering, or applying information; ; a "mild" limitation in the ability to interact with others; a "moderate" limitation in the ability to concentrate, persist, or maintain pace; and a "moderate" limitation in the ability to adapt or manage oneself. (Tr. 184). Dr. Capage's assessment form indicated that Claimant could understand, remember, and carry out work-related activities consisting of 2-3 steps, and could make simple work-related decisions; Claimant could deal with minor changes in the work setting, and with work breaks every two hours, could carry out simple tasks over the course of a workday and workweek; Claimant would be able to respond appropriately to supervision, coworkers, and the general public. (Tr. 187-188). On May 19, 2022, Jeff Boggess, Ph.D.—a state-agency psychological consultant—reviewed the claim at the reconsideration level and affirmed Dr. Capage's opinion. (Tr. 191-193).

## C.    Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no

finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "h[is] ability to perform work despite h[is] limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20

18

C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If he does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot perform other work, the ALJ will find him "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity since he applied for benefits on April 16, 2021. (Tr. 13-14). Next, the ALJ found that the following of Claimant's asserted

impairments constituted "severe" impairments: total body pain syndrome, traumatic brain injury, anxiety disorder, depressive disorder, adjustment disorder, bipolar disorder, and substance abuse disorder. (Tr. 14).

Turning to Claimant's mental-health impairments, the ALJ did not use the special technique—requiring him to assess each of the four areas of mental functioning—to determine the severity of Claimant's mental-health impairments at step two. (*See* Tr. 14-15). Specifically, the ALJ did not assess Claimant's functionality as to (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. *See id.* Instead, the ALJ merely made a conclusory statement that Claimant's anxiety disorder, depressive disorder, adjustment disorder, bipolar disorder, and substance abuse disorder were severe. *See id.*

Next, the ALJ determined that Claimant's medically determinable impairments—including his mental-health impairments—considered both singly and in combination, do not meet or medically equal any of the impairments listed in the Social Security Administration's applicable regulations, at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15). At this stage, the ALJ lightly touched on the four areas of mental functioning. First, in understanding, remembering, or applying information, the ALJ found that Claimant has a moderate limitation. To support this conclusion, the ALJ vaguely listed three facts without elaborating: (1) Claimant "alleged difficulty with memory, understanding, and following directions"; (2) "[u]pon discharge on July 27, 2020, he had fair memory"; and "in July 2021, he answered questions but slowly[.]" (Tr. 15).

Next, in interacting with others, the ALJ found that Claimant has a mild limitation based upon Claimant's report of "not socializing much[.]" (Tr. 15). However, the ALJ

stated that Claimant's lack of socialization was "mainly due to transportation issues[.]" *Id.* The ALJ found it significant that Claimant "reported having no problems getting along with others . . . reported spending time with others in person, on the phone, and by video chat on a daily basis . . . reported going to the doctor, church, and the store on a regular basis . . . [and] the record reveals the claimant has repeatedly been described as cooperative and/or friendly[.]" (Tr. 15-16). With regard to the third area of mental function—concentrating, persisting, or maintaining pace—the ALJ concluded that Claimant has a moderate limitation based upon Claimant's allegations that he has difficulty concentrating and completing tasks. (Tr. 16). The ALJ supported his conclusion by vaguely stating, without elaboration, that "[r]ehabilitation records dated August 2020 revealed the claimant's attention span was at 90 percent . . . [and] in July 2021, he was able to say the days of the week backwards, but it took longer than expected." (Tr. 16). Finally, with regard to the fourth area of mental function—adapting or managing oneself—the ALJ found that Claimant "has experienced a moderate limitation." (Tr. 16). In support of his conclusion, the ALJ merely listed that (1) "claimant alleged difficulty with handling stress and handling changes in routine"; (2) "[d]uring evaluation in July 2020, he had fair insight and judgment"; and (3) "the claimant has a history of substance abuse with a long history of treatment with Suboxone[.]" *Id.*

Based upon his findings that Claimant's mental-health impairments were either "moderate" or "mild" in severity rather than "marked" or "extreme," the ALJ concluded that the "paragraph B" criteria were not satisfied under the Agency's Listings. *Id.* Further, the ALJ found that the "paragraph C" criteria were not satisfied; the ALJ supported his conclusion with the mere conclusory statement that "[i]n this case, the evidence fails to establish the presence of the 'paragraph C' criteria . . . [because] [t]he record does not

establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." *Id.*

Next, the ALJ assessed Claimant's RFC. (Tr. 16-17). The ALJ determined that Claimant has the ability to perform "light" work as defined in 20 C.F.R. 416.967(b), with the following additional limitations:

> he can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance; frequently stoop, kneel, and crouch; and occasionally crawl. The claimant can never work at unprotected heights and never around moving mechanical parts but can work in extreme cold frequently, in extreme heat frequently, and in vibration occasionally. He can never operate a motor vehicle. He can perform simple work. He needs a low-stress work environment defined as no fast-paced production requirements and no greater than occasional changes in a routine work setting.

(Tr. 16).

The ALJ concluded that—given the limitations imposed by the Claimant's RFC, and based upon the testimony of the VE—the Claimant was unable to perform any of his past relevant work. (Tr. 24.) Next, the ALJ noted that Claimant is defined as "a younger individual" with "at least a high school education." *Id.* Relying again on the testimony of the VE, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 25.) As a result, the ALJ ultimately concluded that Claimant "has not been under a disability, as defined in the Social Security Act, since April 16, 2021," and the claim for benefits was denied. (Tr. 26).

## II.  LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard."

*Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    DISCUSSION

Plaintiff essentially sets forth two assertions of legal error in this § 405(g) action: first, that the ALJ improperly discounted the medical opinion evidence with respect to Claimant's physical limitations and supplanted it with his own lay judgment; second, that the ALJ improperly discounted the medical opinion evidence with respect to Claimant's mental limitations; and, third, that the ALJ improperly failed to consider whether there was any twelve-month period during which Claimant was disabled. (ECF No. 7 at 2).

### A.    <u>Medical Opinion Evidence – Physical Impairments</u>

Claimant argues that the ALJ's evaluation of the medical opinion evidence regarding Claimant's physical impairments is marked by error and not supported by substantial evidence. Claimant first points to the opinion of state-agency medical

consultant Rabah Boukhemis, M.D.—adopted on reconsideration by state-agency medical consultant Amy Wirts, M.D.—that Claimant was limited to a "light" level of exertion, with additional limitations of standing or walking for only four hours; never climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs; occasional balancing, stooping, kneeling, crouching, and crawling; and avoiding concentrated exposure to extreme cold or heat, vibration, and even moderate exposure to hazards. (ECF No. 7 at 3-4; Tr. 23-24, 185-195).

Claimant also points to the opinion of consultative examiner Daniel Olson, D.O., that "patient would not be safe returning to work environment, let alone would be difficult given his residual neurologic issues." (ECF No. 7 at 4; Tr. 1089). Claimant highlights Dr. Olson's findings which support this conclusion, including that Claimant "has significant neurologic injury[,] . . . continues to have seizure episodes[,] . . . [and] has memory issues as well as difficulty finding words to say occasionally[.]" *Id.* Dr. Olson further noted paresthesia in the right-upper extremity and "somewhat rare but random movements . . . balance issues," and trouble operating with his extremities on the left side. (ECF No. 7 at 4; Tr. 1084-87).

Claimant explains that, in determining Claimant's RFC, the ALJ rejected and modified several of the limitations recommended by Dr. Boukhemis and adopted by Dr. Wirts. Specifically, the ALJ found that Claimant was capable of frequently, rather than occasionally, stooping, kneeling, and crouching. (Tr. 16). Likewise, the ALJ rejected Dr. Boukhemis's opinion that Claimant should avoid even moderate exposure to hazards and concentrated exposure to extreme vibration, cold or heat, finding instead that Claimant was capable of frequently working in extreme cold or heat as well as occasional exposure to vibration. *Id.* Finally, the ALJ did not limit Claimant to standing or walking for only

four hours. *Id.* Claimant argues that the ALJ's findings as to Claimant's physical limitations were thus "based on lay speculation and contrary to every single medical opinion of record." (ECF No. 7 at 5). Likewise, Claimant argues that the ALJ erred by failing "to adopt limitations to account for Dr. Olson's assessment" that Claimant could not safely return to a work environment, and erred by failing to explain his divergence from the medical-source opinions, in consideration of the supportability and consistency factors for a medical source's opinions pursuant to 20 C.F.R. § 416.920c(b). (ECF No. 7 at 5-6).

In response, Defendant argues that the ALJ specifically addressed the prior administrative and medical findings of Dr. Boukhemis and Dr. Wirts in his written decision. (ECF No. 8 at 11). According to the Defendant, the ALJ found that these limitations were not persuasive "because the record showed that Plaintiff physically recovered from the June 2020 accident, albeit with some residual pain." *Id.* (citing Tr. 23). Defendant adds further that "the ALJ explained, for instance, physical examination findings revealed no muscular asymmetry, no atrophy, no acute joint findings, intact reflexes, negative straight leg raising, and normal sensation." *Id.* (citing Tr. 23, 1087-88, 1120-21, 1332). With respect to Dr. Olson's opinion, the Defendant argued that Claimant's ability to return to work is an issue reserved to the Commissioner and, therefore, Dr. Olson's statement was inherently neither valuable nor persuasive. *Id.* at 12 (citing 20 C.F.R. § 416.920b(c)). Further, Defendant argues that the ALJ did in fact explain why his assessment conflicted with Dr. Olsen's finding, stating that Dr. Olsen's opinion was "not supported by Dr. Olsen's own physical examination findings[.]" (ECF No. 8 at 11; Tr. 24).

Defendant concludes that the ALJ thus did not use mere "lay speculation" as suggested by the Claimant, but rather that "[t]he ALJ did precisely what he was supposed to do as the factfinder—he considered inconsistencies between the prior administrative medical findings and opinion evidence on one hand, and the medical evidence that showed improvement and normal findings on the other." *Id.* at 12. Defendant concludes that Claimant's argument "is merely a disagreement with how the ALJ viewed the evidence; it is insufficient to disturb the ALJ's decision." *Id.* Moreover, Defendant argues that, "contrary to Plaintiff's implication, an ALJ does not need to rely on any matching medical opinion to assess the RFC . . . but may base it on the record as a whole." *Id.* (citing *Felton-Miller v. Astrue*, 459 Fed. App'x 226, 231 (4th Cir. 2011) (unpublished)).

In his reply brief, Claimant argues that the Defendant's response only serves to highlight Claimant's point that "the ALJ impermissibly relied upon his own lay judgment in determining that Mr. Webb did not have the level of impairment supported by the conclusions of the reviewing medical experts[.]" (ECF No. 11 at 4). Specifically, Claimant argues that the ALJ—by merely listing various physical examination findings—based his determination on nothing more than his own lay interpretation of the available medical evidence of record. *See id.* Claimant further argues in his reply brief that the Defendant's reliance on *Felton-Miller* is distinguishable in this case, because Claimant's degree of limitation is not facially obvious to a layperson. (ECF No. 11 at 2). According to Claimant, "the court in *Felton-Miller* clarified in a footnote that indeed, 'bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record.' " *Id.* (quoting *Felton-Miller*, 459 Fed. App'x at 231). Citing to an opinion from the U.S. District

Court for the District of Maryland, Claimant explained that "[u]nless the degree of limitation would be obvious to a layperson as a matter of common sense, an administrative law judge lacks the qualifications to determine RFC based on raw medical evidence and must rely on the findings of a medical expert." *Id.* (citing *Bard v. Soc. Sec. Admin. Comm'r*, 736 F. Supp. 2d 270, 277 (D. Md. 2010)). Because "only a skilled medical professional is qualified to interpret bare medical findings," Claimant argues that "the ALJ's attempt to extrapolate contrary conclusions derived from individual examination findings is tantamount to substitution of lay speculation for the medical expertise"—particularly when the ALJ "rejected every single medical opinion of record[.]" *Id.* at 2-3. Claimant further argues that the ALJ was required by statute to "understandably articulate his findings . . . and explain why he was not including limitations offered by a medical source whose opinion he accorded any degree of persuasive force." *Id.* at 3 (citing 20 C.F.R. § 416.945(e); 42 U.S.C. § 405(b)(1)). Because the ALJ failed to do so, Claimant argues that "remand for further consideration is required" on this basis. *Id.*

A claimant's RFC determination is ultimately "an administrative assessment made by the Commissioner based on all the relevant evidence in the case record." *Felton-Miller*, 459 Fed. App'x at 230-31 (citing §§ 404.1546(c), 416.946(c)). An ALJ is "not required to obtain an expert medical opinion as to [a claimant's] RFC." *Id.* Thus, an ALJ "does not inherently err by determining a Plaintiff's RFC without a specific medical opinion." *Dwight M. F. v. Kijakazi*, 4:21-cv-128, 2022 WL 18636862, at *7 (E.D. Va. Dec. 12, 2022), *adopted*, 2023 WL 1822380 (E.D. Va. Feb. 8, 2023). "Instead, the ALJ is free to craft an RFC based on all the relevant evidence in the record, so long as the ALJ does not *substitute* his or her own lay opinion for a medical expert's opinion." *Id.* (citations omitted). An ALJ substitutes his own lay opinion for a medical expert's by evaluating the significance of

clinic findings, such as drawing his own conclusions from medical imaging despite lacking the expertise to interpret it. *Rought v. Kijakazi*, 1:22-cv-77, 2023 WL 3828035, at *3 (W.D.N.C. June 5, 2023).

As noted above, the Court may review the administrative record to determine whether the Commissioner—through the ALJ—applied the correct legal standards and supported his findings with substantial evidence. *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 94 (4th Cir. 2020) (citation omitted). "To pass muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." *Id.* at 95 (quotations and citation omitted); *see also* 20 C.F.R. § 404.1545(a)(3) (to determine an individual's residual functional capacity, an adjudicator must base his assessment on "all of the relevant medical and other evidence"). If the ALJ fails to build that logical bridge—including, for example, by "selectively citing evidence from the record" or "misstating and mischaracterizing material facts,"—the Court cannot uphold the ALJ's disability determination. *See Arakas*, 983 F.3d at 98–99.

Here, the ALJ's written decision does not create a bridge between the ALJ's determination with respect to Claimant's functional limitations and the relevant evidence in the record; because the ALJ failed to explain the reasoning behind his conclusions, the Court is unable to determine whether the RFC is based upon the record as a whole, or whether the ALJ has supplanted his own lay opinion. By merely listing various physical examination findings—absence of muscular asymmetry, no atrophy, no acute joint findings, intact reflexes, negative straight leg raising, and normal sensation—the ALJ completely sidestepped inconsistent evidence highlighted by the prior administrative medical findings. Particularly in finding that Claimant was capable of frequently, rather than occasionally, stooping, kneeling, and crouching, the ALJ sidestepped records

highlighted in Dr. Boukhemis's findings that Claimant showed some balance problems, unsteadiness in his gait, and seizure-related unsteadiness potential. (Tr. 185-86).

Similarly, to support the ALJ's finding that Dr. Olsen's opinion conflicted with his own physical examination findings of the Claimant, the ALJ merely listed data from Dr. Olson's examination such as absence of "muscular asymmetry, no atrophy, and no acute joint findings[.]" (Tr. 24). By doing nothing more than listing cherry-picked data from Claimant's medical records without any analysis, the ALJ thus failed to build an accurate and logical bridge from the evidence to his conclusion. *Arakas*, 983 F.3d at 100. Simply put, the record does not demonstrate that the ALJ performed an adequate review of the whole record and that the decision to deny benefits is supported by substantial evidence. The ALJ's conclusions may very well have been correct—it is not the Court's role to second-guess the ALJ in resolving conflicting evidence; however, the ALJ is obligated to explain *how* he resolved that conflicting evidence—something he did not do here. Consequently, remand is required on this basis.

### B.    Medical Opinion Evidence – Mental Impairments

Next, Claimant points to the ALJ's finding that the opinions of state-agency reviewing psychologists James Capage, Ph.D., and Jeff Boggess, Ph.D.—that Claimant was limited to carrying out work-related activities consisting of 2-3 steps and making only simple work-related decisions; could deal with only minor changes in the work setting; would require work breaks every two hours; and would be limited to carrying out simple tasks over the course of a work day and work week–were "not persuasive." (ECF No. 7 at 6; Tr. 23-24). Claimant argues that "the ALJ provided no explanation for this rejection" beyond a conclusory statement that "the claimant would need a low-stress work environment based on his reported and observed anxiety[.]" (ECF No. 7 at 7; Tr. 23).

According to Claimant, "if the only reason the ALJ saw fit to reject these . . . opinions had been simply . . . that greater limitations were warranted, he should have incorporated those limitations contained within their assessments and gone on to incorporate still greater restrictions to account for the low-stress environment[.]" (ECF No. 7 at 7). Consequently, Claimant argues that the ALJ's decision is marked by error and not supported by substantial evidence. *Id.* Claimant argues that this error was not harmless, because the additional restrictions would have significantly undermined the VE's testimony that Claimant was capable of performing two of the three representative jobs in the national economy. *Id.* at 7-10.

In response, the Defendant argues that the ALJ chose not to incorporate the prior administrative findings of Dr. Capage and Dr. Boggess "for legitimate, articulated reasons," and that Claimant is merely expressing disagreement with the ALJ's resolution of conflicting evidence by improperly pointing to other portions of the record that could lead to a different conclusion. (ECF No. 8 at 14-15). Defendant further argues that, even accepting Claimant's argument, any error would be harmless because the VE's testimony regarding the third representative job of housekeeper/cleaner—with 16,000 positions available in the national economy—"still remains." *Id.* at 14.

In his reply brief, Claimant challenged Defendant's argument that the ALJ provided "legitimate, articulated reasons" for choosing not to incorporate these prior administrative findings. (ECF No. 11 at 9). Claimant argues that "[t]he ALJ provided no explanation for this rejection, writing only that 'the undersigned finds the opinions are not persuasive as the claimant would need a low-stress work environment based on his reported and observed anxiety.' " *Id.* (quoting Tr. 23).

Once again, the ALJ's written decision simply fails to create an accurate and logical bridge between the evidence and the ALJ's determination. The undersigned agrees with Claimant that, fundamentally, the ALJ's conclusory statement made in mere passing—that "claimant would need a low-stress work environment based on his reported and observed anxiety"—falls far short of the *Arakas* standard requiring the ALJ to build an accurate and logical bridge between the evidence and the ALJ's conclusion. Nothing about the ALJ's statement provides any insight into the ALJ's determination that Dr. Capage and Dr. Boggess were unpersuasive in opining that Claimant was limited to carrying out work-related activities consisting of 2-3 steps and making only simple work-related decisions; could deal with only minor changes in the work setting; would require work breaks every two hours; or would be limited to carrying out simple tasks over the course of a work day and work week. The Court may not fill in the missing analysis with speculation; rather, the ALJ's analysis must allow for meaningful judicial review. Simply put, the ALJ's written decision did not do so here. Accordingly, because the Court's ability to conduct meaningful review has been frustrated by the ALJ's failure to create an accurate and logical bridge between the evidence and the ALJ's conclusion, the undersigned **FINDS** that the ALJ's decision is not supported by substantial evidence.

Nor is the ALJ's failure harmless under the circumstances, as there remains a question of fact as to whether the remaining representative job testified to by the VE—that of housekeeper/cleaner, with only 16,000 positions available—exists in significant numbers in the national economy. The Social Security Act provides that an individual may be determined to be disabled if he is unable to perform not only his previous work but also "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Work "exists in the national economy" if it "exists in significant

numbers either in the region where [the] individual lives or in several regions of the country." *Id.* The issue of whether jobs exist in significant numbers is a question of fact to be determined by the ALJ based upon the facts of the case. *Martinez v. Heckler*, 807 F.2d 771, 775 (9th Cir. 1986). *See also Milhem v. Kijakazi*, 52 F.4th 688, 695 (7th Cir. 2022) ("In determining whether there is a "significant" number of jobs in the national economy, the regulatory scheme gives the ALJ discretion to decide, using substantial evidence, when a number of jobs qualifies as significant."); *Lamoureux v. Comm'r of Soc. Sec. Admin.*, 21-cv-1677, 2021 WL 5860738, at *2 (3d Cir. Dec. 10, 2021) (explaining that "an ALJ's factual findings as to what number of jobs . . . constitute work which exists in the national economy—are conclusive in judicial review of the benefits decision so long as they are supported by substantial evidence"); *Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1318 (11th Cir. 2021) ("Whether there are a significant number of jobs a claimant is able to perform with his limitations is a question of fact to be determined by a judicial officer"); *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (explaining that the determination of "whether work exists in significant numbers . . . should ultimately be left to the [factfinder's] common sense in weighing the statutory language as applied to a particular claimant's factual situation"). Because there is no bright-line rule and the ALJ is required to make a finding of fact, the Court cannot meaningfully determine whether the ALJ's finding is supported by substantial evidence based upon the VE's testimony that 16,000 jobs exist in the national economy. *See, e.g.*, *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) ("Under our current case law, the ALJ's finding that 25,000 national jobs is sufficient presents a close call."). Thus, because the ALJ's error is not harmless, remand is required.

### C.      <u>Duration of Disability</u>

Lastly, Claimant argues that "[t]he ALJ's failure to consider the vocational impact of [Claimant's] frequent hospitalizations and emergency room visits was legal error, and remand is required." (ECF No. 7 at 14). In support of this argument, Claimant asserts that "[t]he ALJ acknowledged and described [Claimant's] extensive hospitalization and rehabilitative treatment following his June 2020 motor vehicle accident . . . [but] performed absolutely **ZERO** analysis of how these hospitalizations and the rehabilitative treatment would have impacted [Claimant's] ability to work . . . [d]uring the 12 month period following [Claimant's] initial motor vehicle collision on June 28, 2020[.]" (ECF No. 7 at 13). Due to multiple hospitalizations and rehabilitation, Claimant argues that he would have missed at minimum a total of 45 days of work between June 2020 and June 2021. *Id.* at 14. Based upon the VE's testimony that a person who was off task 20% or more of the day could not work, Claimant argues "[t]his attendance issue alone would present a substantial limitation to working on a regular and continuous basis as required in competitive full-time employment." *Id.* at 13-14 (citing Tr. 176; SSR 96-8p, 1996 WL 374184 *2). Claimant concludes that the ALJ's "[f]ailure to acknowledge or account for this proven limitation requires remand," on the grounds that "it is impossible to conclude that [Claimant] could have sustained competitive work activity during the period at issue." *Id.* at 14 (citing 42 U.S.C. § 423(d)(1)(A)). In light of the undersigned's findings, *supra*, that the ALJ's failure to explain the rationale for his decision frustrates meaningful review, remand is required, and Claimant's argument on this basis is thus **MOOT**.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request for remand (ECF No. 7), **DENY** the

Defendant's request to affirm the final decision (ECF No. 8), **REVERSE** the final decision of the Acting Commissioner; and **REMAND** this matter back to the Acting Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Berger.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:   January 10, 2025

Dwane L. Tinsley
United States Magistrate Judge

34